## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GEOFFREY BRITTON BIRD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1785-CJB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

Gary C. Linarducci, LINARDUCCI & BUTLER, PA, New Castle, DE and Karl E. Osterhout, OSTERHOUT BERGER DISABILITY LAW, LLC, Oakmont, PA, Attorneys for Plaintiff.

David C. Weiss, United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware; Eric P. Kressman, Regional Chief Counsel, Corey Fazekas, Assistant Regional Counsel and Heather Benderson, Special Assistant United States Attorney, SOCIAL SECURITY ADMINISTRATION, Philadelphia, PA, Attorneys for Defendant.

---

## <u>MEMORANDUM OPINION</u>

April 10, 2019
Wilmington, Delaware



**BURKE, United States Magistrate Judge**

Plaintiff Geoffrey Britton Bird ("Bird" or "Plaintiff") appeals from a decision of Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34.  This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Bird and the Commissioner.  (D.I. 14, 15)  Bird asks the Court to reverse the Commissioner's decision and remand this matter to the Commissioner for a rehearing.  (D.I. 14 at 22)  The Commissioner opposes that request and asks that the Court affirm her decision.  (D.I. 16 at 14)  For the reasons set forth below, Bird's motion for summary judgment will be DENIED and the Commissioner's cross-motion for summary judgment will be GRANTED.

## I.     BACKGROUND

### A.     Procedural Background

On May 28, 2013, Bird filed an application for Title II and Title XVIII, Part A Social Security benefits; he alleged disability beginning on May 1, 2013.  (D.I. 12 (hereinafter "Tr.") at 20; *id*. at 208)  His claim was denied initially and then again upon reconsideration.  (*Id*. at 20)  Bird then filed a request for a hearing.  (*Id.*)  On September 2, 2016, a video hearing was held before an Administrative Law Judge ("ALJ"), at which Bird was represented by counsel.  (*Id.*)

On October 13, 2016, the ALJ issued a decision denying Bird's request for disability benefits.  (*Id*. at 38)  Bird requested review of the ALJ's decision by the Appeals Council and the Appeals Council later denied Bird's request.  (*Id.* at 1-6)  Thus, the ALJ's decision became the

final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On December 12, 2017, Bird filed a Complaint in this Court seeking judicial review of the ALJ's decision. (D.I. 1) On December 21, 2017, the parties consented to the Court's jurisdiction to conduct all proceedings in this action, including entry of a final judgment. (D.I. 9)

On June 11, 2018, Bird filed his motion for summary judgment. (D.I. 14) The Commissioner opposed Bird's motion and filed a cross-motion for summary judgment on July 11, 2018. (D.I. 15)

## B. Factual Background

At the time of the alleged onset of his disability on May 1, 2013, Bird was 59 years old; at the time of the ALJ's decision in October 2016, he was 63 years old.[1] (*See* Tr. at 37, 208)

Bird has his GED, (*id.* at 37, 51), and previously attended two years of college, (*id.* at 51, 454). He served in the United States Marine Corps for two years, (*id.* at 51), and has past work experiences as, *inter alia*, a chauffeur, a taxi-driver, a door-to-door sales representative and a home improvements sales representative. (*Id.* at 36, 52-56; *see* D.I. 14 at 3)

### 1. Plaintiff's Medical History, Treatment, and Condition

Bird alleges that he has been disabled and unable to work since early 2013 due to his various medical conditions. (Tr. at 251, *see id.* at 28) Relevant evidence of record regarding those conditions is set out below.

---

[1]     Bird has indicated a desire to keep his "precise birthdate" vague in order to "protect his personal identifying information[.]" (D.I. 14 at n.1) The Court honors that request herein, noting that it has verified Bird's exact birthdate, which is located at various points in the record, (*see* Tr. at 37, 208).

### a. Physical Medical History[2]

Bird alleges that he suffers from the following physical conditions: (1) hepatitis C and liver disease; (2) fusions in his back and neck; (3) a triple fusion in his back; (4) a double fusion in his neck; and (5) arthritis. (*Id.* at 23)

With regard to his hepatitis C, medical records from the Wilmington Veterans Affairs Medical Center's (the "WVAMC") liver clinic show that Bird had been diagnosed with hepatitis C in 2001. (*Id.* at 23, 391-92) He was asymptomatic as of May 2012, (*id.* at 23, 392-95), and as of March 2015, he reported to a neurologist that his hepatitis C treatment was very good, (*id.* at 23). As of early/mid-2015, following treatment with Harvoni, the virus was undetectable. (*Id.*; *see also id.* at 522)

As for Bird's back-and-neck-related pain, it first began in 1979, and reoccurred occasionally until 1983 when the pain "increased without any clear inciting event." (*Id.* at 453) Bird managed his pain through chiropractic care until 1991, when he was diagnosed with severe disk damage; years later, Bird underwent both cervical and lumbar fusions. (*Id.*) Once the back and neck pain returned in 2012, Bird began using pain medication (including methadone and Oxycodone) on a regular basis. (*Id.* at 29, 453) In 2013, physical examinations showed that Bird had decreased range of motion, decreased mobility, and poor flexion and extension related to his spine. (*Id.* at 29-30) An MRI in December 2013 showed that Bird had status post fusion from L2 through L5, mild disc narrowing at L1/L2, conus medullaris terminating at T12/L1, and mild broad-based disc bulging. (*Id.* at 31) Although his physical condition did not appear to

---

[2]     Because the arguments set forth by Bird and the Commissioner primarily involve Bird's mental health-related medical issues or other legal disputes, the Court will here offer only a brief summary of Bird's physical medical history.

change, Bird complained of worsening pain in 2014 and continued to treat it with pain medication. (*Id*.) After a series of physical therapy treatments from late 2014 through early 2015, Bird's pain and mobility improved. (*Id.*) By July 2015, it was noted that Bird's pain was under control and well-managed through medication; Bird then self-reported that he was doing "exceptionally well." (*Id*. at 32)

### b. Mental Health-related Medical History

Bird alleges that he suffers from depression. (*Id*. at 23)

The first record of Bird seeking treatment for mental health issues is in January 2003, when Bird was referred for evaluation to help with the management of his pain due to arthritis in his neck and back. (*Id*. at 657) In April 2003, he began taking Sertraline for an adjustment disorder with anxiety, though soon after, he stopped going to the WVAMC mental health clinic. (*Id*.) After a four-year hiatus, in 2007, Bird returned to the clinic because he began experiencing panic attacks in his new sales job; at that time, Bird began taking Zoloft. (*Id*.) In August 2007, Bird first met Dr. Mario Castillo, M.D. at the clinic, and Dr. Castillo prescribed him medication for panic attacks. By May 2008, Bird had stopped visiting the clinic and he did not go back until March 2010. In early-to-mid-2010, Bird expressed that he was experiencing depression and was having back and neck pain, which impacted his ability to work. (*Id*.)

Bird's mental health treatment records pick up again in 2012. In March 2012, Bird requested a mental health referral from WVAMC because of a panic disorder; records indicate he wished to start taking Zoloft again and that a physician renewed a prescription of Zoloft for him. (*Id.* at 435-36) One month later, in April 2012, Bird was evaluated at the WVAMC by a licensed clinical social worker ("LCSW"). (*Id*. at 428-34) During that appointment, Bird explained that he had "'just life's problems'" and "'a bad back.'" (*Id*. at 429) His appearance was deemed

good and appropriate for the weather and he was "cooperative and engaged." (*Id*. at 432) Bird exhibited good judgment during the visit, he was focused and engaged, his memory was fine and intact, his thought process was logical and goal directed, he had good insight and judgment, his concentration had improved and he exhibited no problematic behaviors. (*Id*. at 432-33) The LCSW noted that Bird was suffering from an "adjustment disorder" and depression as a result of the difficulties in finding work due to his back pain. (*Id*. at 432-33 (noting that Bird reported "powerless moods"))

On October 2, 2013, Bird was seen by a licensed psychologist, Dr. Pedro Saez, Ph.D, during a Commissioner-sponsored consultative evaluation; the evaluation was completed in order to determine the "level of functional problems for disability determination purposes[.]" (*Id*. at 445; *see also* D.I. 14 at 4) Dr. Saez noted that Bird had taken medication for anxiety since the 1990s and had been engaged in outpatient psychotherapy in brief intervals. (Tr. at 445) Bird reported that he had recently been having nightmares, difficulty sleeping and reduced self-esteem. (*Id*.) He confirmed that he was capable of independently taking care of all of his activities of daily living and the majority of the instrumental activities of daily living, such as transportation, medication and money management (though he received assistance with some activities, like housekeeping, shopping or meal preparation). (*Id*. at 446) Dr. Saez observed that Bird was "well-groomed" and that, although Bird seemed "somewhat distressed," he "laughed and offered humorous remarks easily indicating a full range of affect." (*Id*. at 447) While Bird did score a borderline result on the global cognitive functioning test, Dr. Saez found that some portions of Bird's performance were "quite poor suggesting symptoms magnification." (*Id*.) Dr. Saez observed that Bird "appeared pleasant and polite with adequate social comportment." (*Id*.) Dr. Saez also concluded that Bird's back pain was likely the most significant issue Bird faced at

the time, since Bird's "current depression and anxiety reactive to pain and stress [were] relatively mild." (*Id.*) The report noted that Bird had previously been capable of working while managing any episode of depression or anxiety. (*Id.* at 447-48) And lastly, Dr. Saez added that Bird had a "[g]ood" prognosis and "would benefit from ongoing pain management to address back pain issues." (*Id.* at 448) He suggested that Bird engage in vocational rehabilitation services to help him find a job. (*Id.*) In Dr. Saez's opinion, Bird "possesse[d] capacity for performing various job functions including: understanding, carrying out and remembering instructions, responding appropriately to supervision, co-workers, and work pressures in a work setting on a psychological basis." (*Id.*)

On the same date (October 2, 2013), Dr. Saez filled out a two-page Psychological Functional Capacities Evaluation Form. (*Id.* at 449-50) The form required Dr. Saez to circle various options in order to articulate the extent to which Bird's various abilities were impaired. (*Id.*) There were two areas where Dr. Saez found Bird to have a "moderate" degree of impairment (meaning that it was an impairment that affects but does not preclude the ability to function): "[r]estriction of daily activities" and "[s]ustain work performance & attendance in a normal work-setting[.]" (*Id.*) For all other functional aspects, Dr. Saez found Bird to have either a "mild" degree of impairment (meaning that it was an impairment of "slight importance" that does not affect the ability to function) or no impairment at all. (*Id.*)

On November 11, 2013, state agency physician Dr. Alex Siegel, Ph.D provided an opinion regarding Bird's depression and his ability to work. (*Id.* at 91-102) Dr. Siegel concluded that there was nothing in Bird's medical record "to indicate that [Bird's] mental impairment [was] so severe as to prevent the claimant from working." (*Id.* at 96) In support, Dr. Siegel cited to the fact that Bird had not then been prescribed any psychotropic medications, that

Bird attributed his functional limitations to his physical impairments and that Dr. Saez had recently described Bird's depression and anxiety as relatively "mild" compared to Bird's back pain. (*Id.*)

Bird returned to the WVAMC mental health clinic in February 2014. (*Id.* at 657) He began to be followed by Dr. Gaber Yacoub, M.D, a psychiatrist. (*Id.*)

On March 24, 2014, state agency physician Dr. Jessy Sadovinik, Psy.D. also provided an opinion regarding Bird's depression and its impact on his ability to work. Dr. Sadovinik concluded that there was nothing in Bird's medical record to indicate that Bird's "mental impairment [was] so severe as to prevent [him] from working." (*Id.* at 111) Dr. Sadovinik relied largely on the same evidence that Dr. Siegel had cited in support of this conclusion. (*Id.*)

On August 20, 2014, at the direction of Bird's counsel, Dr. Yacoub completed a mental impairment questionnaire regarding Bird. (*Id.* at 505-11) Dr. Yacoub wrote that Bird felt anxious and irritable and had a "fair" prognosis. (*Id.* at 506) He found that Bird was not "[s]eriously limited" (i.e., that his ability was reduced by 20-33%) or "[p]oor" (i.e., that his ability was reduced by 34-66%) in his ability to perform any mental functions. (*Id.* at 508-09) Dr. Yacoub found that Bird was "[l]imited" (i.e., that his ability was reduced by 11-19%) in his ability to perform 17 different functions, and "[u]nlimited" or "[v]ery [g]ood" (i.e., his ability was reduced by 0-10%) in his ability to perform eight other functions. (*Id.*) Dr. Yacoub found that Bird had moderate functional limitations, that he had a complete inability to function independently outside the home and that his impairments would cause him to miss about one day a month of work. (*Id.* at 510)

In November 2014, Bird spoke with a WVAMC nurse regarding the fact that Bird had recently missed an appointment with his psychiatrist. (*Id*. at 568) Bird reported that he was "doing well and [did] not need to be seen as a walk-in." (*Id*.)

In December 2014, a WVAMC LCSW saw Bird in relation to his depression. (*Id*. at 556) It was noted that Bird had a normal mood, a restless posture, made good eye contact, was well-groomed and had the appropriate intensity and affect. (*Id*. at 560) His thought content was appropriate, his thought processes were coherent, his affect and intensity were appropriate, his range was restricted, and he showed average intellect and exercised good judgment. (*Id*. at 561) The LCSW wrote that Bird had "depression due to medical condition[.]" (*Id*.)

In February 2015, Dr. Yacoub met with Bird at the WVAMC mental health clinic. (*Id*. at 543) During that examination, Dr. Yacoub found that Bird had "[g]eneralized anxiety reaction[.]" (*Id*. at 544) He also noted that Bird was dressed appropriately, made good eye contact, was cooperative, had a full range of affect, intact memory and had no psychomotor agitation. (*Id*. at 545) Bird was directed to continue taking Zoloft. (*Id*. at 546) A few months later, at a follow-up appointment in May 2015, Dr. Yacoub noted that Bird reported that he was doing "ok" and had stopped taking Zoloft (in order to try to cut down the use of other medication while he was taking a new medication for his hepatitis C). (*Id*. at 517) Bird had a good general appearance, was dressed appropriately, was cooperative and exhibited full range of affect. (*Id*.)

In April 2016, Bird had a walk-in appointment at WVAMC and was seen by Dr. Castillo. (*Id*. at 625)[3] Bird reported that he had previously been taking Sertraline, but then "was doing much better" and so he had stopped taking it. (*Id*.) Bird asked to re-start the medication, due to

---

[3]     Dr. Yacoub had resigned from the WVAMC in May 2015. (Tr. at 625)

some new stressors in his life, including health issues and unemployment. (*Id.*) Dr. Castillo noted that Bird was groomed and neat, cooperative and polite, had a constricted affect, linear thought process, logical and relevant thought content, was oriented, was interested in getting better, was cooperative and had good impulse control. (*Id.* at 626) Bird reported no thoughts of suicide. (*Id.*) Dr. Castillo re-prescribed Sertraline to Bird. (*Id.*)

In June 2016, Bird again sought treatment from Dr. Castillo, as Bird's mother had just passed away and he was having difficulties with sleeping. (*Id.* at 609) Bird was again prescribed Sertraline. (*Id.*) During the visit, Dr. Castillo noted that Bird was appropriately attired, well-groomed and neat in appearance. (*Id.* at 610) Although he looked tired and showed poor memory, Bird made good eye contact and was cooperative, had a fair range of affect, was organized and coherent, was alert and oriented, showed fair judgment, was insightful and had good impulse control. (*Id.*) Bird reported no thoughts of suicide. (*Id.*)

In August 2016, Dr. Castillo again met with Bird during an office visit. (*Id.* at 657) Dr. Castillo wrote that when he started seeing Bird back in 2014, Bird's symptoms were "more of panic attacks but his anxiety and depression from his back problems continue [and] he has had more stressors in his personal life compared to when he was first seen." (*Id.* at 658) Dr. Castillo also noted that during this visit, Bird's appearance was groomed and neat, that he was cooperative, his speech was normal, his mood was anxious and worried, his affect showed constricted range, his thought process was organized, his thought content was logical and coherent, his memory and concentration were poor, his judgment was compliant with treatment and his impulse control was good. (*Id.*) According to Dr. Castillo's treatment notes, Bird reported no thoughts of suicide. (*Id.*)

At the direction of Bird's counsel, Dr. Castillo also completed a mental impairment questionnaire in August 2016. Dr. Castillo wrote therein that Bird continued to be significantly anxious and depressed over being unable to work; he also wrote that Bird had "had thoughts of suicide." (*Id.* at 651) Bird's prognosis was listed as "guarded" since Bird's "life stressors remain[,] including employment as a result of back problem." (*Id.*) Dr. Castillo found Bird to be "[p]oor" at his ability to perform five listed functions.[4] (*Id.* at 653-54) He found Bird to be "[s]eriously limited" in his ability to perform 15 listed functions.[5] (*Id.*) And he found Bird to be "[l]imited" in his ability to perform five other functions, while being "[u]nlimited or [v]ery [g]ood" in no functions.[6] (*Id.*) Dr. Castillo found that Bird had "marked" functional limitations (meaning that they seriously interfered with Bird's ability to function independently, appropriately, effectively and on a sustained basis) in the areas of maintaining social functioning,

---

[4]     These functions included: (1) maintaining attention for a two-hour segment; (2) maintaining regular attendance and being punctual; (3) performing at a consistent pace without an unreasonable number and length of rest periods; (4) accepting instructions and responding appropriately to criticism from superiors; and (5) using public transportation. (Tr. at 653-54)

[5]     These functions included: (1) remembering work-like procedures; (2) understanding and remembering very short and simple instructions; (3) working in coordination with or in proximity to others without becoming unduly distracted; (4) completing a normal workday and workweek without interruptions from psychologically based symptoms; (5) getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (6) responding appropriately to changes in a routine work setting; (7) dealing with normal work stress; (8) being aware of normal hazards and taking appropriate precautions; (9) understanding and remembering detailed instructions; (10) carrying out such instructions; (11) setting realistic goals or making plans independently of others; (12) dealing with stress of semiskilled or skilled work; (13) interacting appropriately with the general public; (14) maintaining socially appropriate behavior; and (15) traveling in unfamiliar places. (Tr. at 653-54)

[6]     The "[l]imited" functions included: (1) carrying out short, simple instructions; (2) sustaining an ordinary routine without special supervision; (3) making simple work-related decisions; (4) asking simple questions or requesting assistance; and (5) adhering to basic standards of neatness and cleanliness. (Tr. at 653-54)

maintaining concentration, persistence or pace and episodes of decomposition. (*Id.* at 655) He found that Bird's impairments would cause him to miss more than four days of work per month. (*Id.*)

### 2. The Administrative Hearing

At the administrative hearing held via videoconference on September 2, 2016, the ALJ heard the testimony of Bird and Edith Edwards, an impartial Vocational Expert ("VE"). (*Id.* at 46-89)

#### a. Bird's Testimony

At the hearing, Bird provided some basic personal information to start and then began to discuss his last 15 years of work history. (*Id.* at 48-51) Bird confirmed that he previously worked from 2011 to 2013 as a limo driver—the type that primarily chauffeured people and carried or handled light baggage (up to approximately 20 pounds). (*Id.* at 52-53) Before that, he worked in a similar role but for an airport shuttle company where he handled heavier bags. (*Id.* at 53-54) From 1998 to 2011, Bird was self-employed in the home improvement sales sector. (*Id.* at 54) Other work experiences in the 2000s included cable communications door-to-door sales and concrete/paving services sales. (*Id.* at 54-56)

Eventually questioning turned to Bird's mental health issues. Bird testified that he was being treated for depression, panic attacks and "not wanting to leave his house" (agoraphobia). (*Id.* at 62) He explained that Dr. Yacoub had previously treated him and that he was then being treated by Dr. Castillo. (*Id.* at 62) Bird described his depression and how taking Zoloft had helped ease the symptoms. (*Id.* at 63) He also testified that he experienced difficulties with concentrating and that his "memory and stuff was fine until recently[.]" (*Id.*)

Bird testified that he can no longer perform the jobs that he previously held. When Bird's counsel asked if Bird could return to being a limo driver, Bird responded that he could not because he "couldn't take it." (*Id.* at 63-64) He then elaborated that driving in that type of job, would be painful and that he could not concentrate. (*Id.* at 64, 66, 68-69) Bird testified that he stopped driving when he filed his claim for benefits. (*Id.* at 65) Bird also explained that his inability to concentrate meant that he could not continue to perform sales work. (*Id.*)

In terms of his daily activities, Bird testified that he does not do anything around the house, or relating to cleaning or grocery shopping, as his ex-wife and son do those chores. (*Id.* at 69-70) Bird said that his "thing was going to work[.]" (*Id.* at 70)

### b. Vocational Expert's Testimony

VE Edwards also testified during the hearing. After confirming that her testimony would be "consistent with the guidance from the <u>Dictionary of Occupational Titles</u> and the SCO[,]" she explained that she was aware that Bird had work experience as a chauffeur, limo driver and a door-to-door salesperson. (*Id.* at 72 (emphasis in original)) She stated that Bird's work as a chauffeur would be classified as light in exertion, semi-skilled and as a Skilled Vocational Preparation ("SVP") Level 3. (*Id.*) His experience as a limo driver mirrored the "taxi driver" classification, which is listed as a medium exertion, unskilled job with an SVP Level 2. (*Id.*) She then explained that Bird's job as a door-to-door sales representative is a light exertion, unskilled job with an SVP Level 2. (*Id.*) Edwards noted that Bird did hold a position in the last 15 years that was considered "skilled"—Bird's job as a self-employed home improvements sales representative. (*Id.* at 72-73) That position would be considered a light exertion, skilled job at an SVP Level 6. (*Id.* at 73)

Next, the ALJ asked whether Bird's prior jobs required skills that would be transferrable to sedentary work. (*Id*. at 73) The VE, with the ALJ's assistance, then asked Bird a series of questions with regard to Bird's skills and experiences in his past employment. (*Id*. at 73-76) Thereafter, the VE testified that the skills transferable to sedentary work would include:

> Reports and recordkeeping, customer service which would include things as sales persuasion, providing of information, problem resolution, handling of complaints, knowledge of the home improvement industry and building materials and such, scheduling of appointments, ordering. Then there's another facet of the job which is hiring of a crew, which that requires some supervision and directing them of what you want done. In that capacity, when you do that, you're basically a supervisor then until they get the job done. And then if they're —you have to go back in and inspect the work, what they've done, and take care of the issues if there are any. You're like the go-between person.

(*Id*. at 76-77) Then the ALJ gave the VE a hypothetical:

> Assume a person of claimant's age, education, work experience who is able to perform the exertional demands of sedentary work as defined by Social Security regulations. Additionally, the person can occasionally climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, or crawl. The person would be limited to only occasional rotation or extension of the neck. The person must avoid concentrated exposure to extreme cold, must avoid concentrated exposure to excessive vibration, and must avoid all exposure to unprotected heights and all exposure to hazardous machinery. Based upon all those limitations, would those skills still be applicable in the jobs that you're—were going to give me as far as transferable skills?

(*Id*. at 77-78) The VE considered the limitations, asked the ALJ a few questions about them, and then testified that the skills would transfer, with "[v]ery minimal" or "[v]irtually no[]" necessary vocational adjustment, to the sedentary jobs of "telephone solicitor" (a semi-skilled, sedentary job with an SVP of 3), "scheduler/appointment clerk" (a semi-skilled, sedentary job with an SVP of 3), and "information clerk" (a semi-skilled, sedentary job with an SVP of 4). (*Id*. at 79-80)

The ALJ later posed another hypothetical: if a person had "pain and mental impairments [that] limited him to simple, routine tasks, basically unskilled work[,]" how would that affect his ability to perform the jobs that the VE had described? (*Id.* at 82) The VE responded that were this the case, "there would be no work . . . based on transferability." (*Id.*)[7]

### 3. The ALJ's Findings

On October 13, 2016, the ALJ issued his decision, which included the following 11 findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
>
> 2. The claimant has not engaged in substantial gainful activity since May 1, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. *The claimant has the following severe impairments: status post lumbar and cervical spinal surgeries* (20 CFR 404.150(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform

---

[7] Bird's counsel also questioned the VE. Counsel noted that the VE had explained that one of the skills that could be transferred to these exemplary jobs was the ability to inspect work; he asked the VE how such inspection could be done "from a sedentary position[.]" (*Id.* at 83) The VE explained that the work would be inspected visually and that it is possible to do that when you have a sedentary job. (*Id.*) Bird's counsel also asked about how Bird's knowledge of the home improvement industry would transfer to certain of the aforementioned jobs. (*Id.*) The VE responded that she had placed people with similar backgrounds in the home improvement industry into such jobs in the past; such persons "strictly work on the phone[,]" schedule appointments, solicit new business and/or could serve as "information clerk" at a hardware store. (*Id.* at 83-84) Lastly, Bird's counsel questioned the VE as to whether a person like Bird would need to have computer skills (which Bird lacks) in order to perform these jobs; the VE said that such skills were not necessary to perform the work. (*Id.* at 84-85)

sedentary work as defined in 20 CFR 404.1567(a) except he can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, or crawl; is limited to only occasional rotation or extension of the neck; must avoid concentrated exposure to extreme cold and excessive vibration; and must avoid all exposure to unprotected heights and hazardous machinery.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on [date omitted, *see supra* n.1] and was [between 55 and 59] years old, which is defined as an individual of advanced age, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching retirement age (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. *Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy* (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. at 22-38 (certain emphasis added, certain emphasis omitted))

## II.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In determining the appropriateness of summary judgment, the Court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### B. Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (citation omitted). In analyzing whether substantial evidence supports the Commissioner's factual findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Even if the reviewing court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision to determine whether the correct legal standards were applied. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court's review of legal issues is plenary. *Id.*

### III. DISCUSSION

In resolving the instant motions, the Court will first review the relevant law regarding the disability determination process. It will then go on to assess Bird's arguments on appeal.

### A.  Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for disability insurance benefits, the claimant must establish that she was disabled prior to the date she was last insured. 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined for purposes of SSI as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R § 416.920; *see also Russo v. Astrue*, 421 F. App'x. 184, 188 (3d Cir. 2011). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of nondisability

when claimant is engaged in substantial gainful activity). If the claimant is not engaged in

substantial gainful activity, step two requires the Commissioner to determine whether the

claimant is suffering from a severe impairment or a combination of impairments that is severe.

20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's

impairments are not severe). If the claimant's impairments are severe, then the Commissioner

proceeds to step three, and must compare the claimant's impairments to a list of impairments (the

"listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. §

404.1520(a)(4)(iii); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). When a claimant's

impairment meets or equals an impairment in the listings, the claimant is presumed disabled. *See*

20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment fails to meet or medically equal any

listing, the Commissioner should proceed to steps four and five. 20 C.F.R. § 404.1520(e).

 At step four, the Commissioner determines whether the claimant retains the residual

functional capacity (or "RFC") to perform his or her past relevant work. 20 C.F.R. §

404.1520(a)(4)(iv) (stating that a claimant is not disabled if he or she is able to return to past

relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still

able to do despite the limitations caused by his or her impairment(s)." *Johnson v. Comm'r of

Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotation marks and citation omitted).

"The claimant bears the burden of demonstrating an inability to return to [his or] her past

relevant work." *Plummer*, 186 F.3d at 428.

 If the claimant is unable to return to his or her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude him or her from

adjusting to any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-

disability when the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last

step, the burden of production is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Id.* In other words, the ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his or] her medical impairments, age, education, past work experience, and residual functional capacity." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a VE (as the ALJ did here). *Id.*

### B. Bird's Arguments on Appeal

On appeal, Bird presents two arguments. First, he argues that at step five of the disability determination process, the ALJ failed to properly evaluate the transferability of Bird's skills. (D.I. 14 at 6) Second, he asserts that the ALJ erred at step two in determining that Bird's depression was not a "severe" impairment. (*Id.* at 11) The Court addresses these arguments in turn.

### 1. The ALJ's Application of the Special Rules of Transferability Based on Bird's Age at Step Five

As noted above, Bird's first argument on appeal relates to the ALJ's step five finding. There, the ALJ determined that certain of Bird's skills developed during past employment would readily transfer to three other sedentary jobs that were referenced in the ALJ's decision. (Tr. at 37-38)

Applicable Social Security regulations state that a claimant will be considered to have skills that are "transferable" when the "skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1) (noting that this "depends largely on

the similarity of occupationally significant work activities among different jobs"); *see also*

*Harris v. Astrue*, Civil Action No. 08-80J, 2009 WL 3030803, at *3 (W.D. Pa. Sept. 17, 2009).

The regulations explain that transferability of skills is "most probable and meaningful" among

jobs in which: (1) the same or lesser degree of skills is required; (2) the same or similar tools

and machines are used; and (3) the same or similar raw materials, products, processes or services

are involved. 20 C.F.R. § 404.1568(d)(2); *see also Harris*, 2009 WL 3030803, at *3. However,

a complete similarity of all three factors is not necessary for transferability. 20 C.F.R. §

404.1568(d)(2); *see also Harris*, 2009 WL 3030803, at *3.

     The regulations also address considerations for ready transferability of skills for "persons

of advanced age" as it relates to sedentary work. 20 C.F.R. § 404.1568(d)(4). They explain,

*inter alia*, that:

> If you are of advanced age [age 55 or older] and you have a severe
> impairment(s) that limits you to no more than sedentary work, we
> will find that you have skills that are transferable to skilled or
> semiskilled sedentary work only if the sedentary work is so similar
> to your previous work that you would need to make very little, if
> any, vocational adjustment in terms of tools, work processes, work
> settings, or the industry.

*Id.*; *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 2, Rule 201.00(f) ("In order to find

transferability of skills to skilled sedentary work for individuals who are of advanced age (55 and

over), there must be very little, if any, vocational adjustment required in terms of tools, work

processes, work settings, or the industry."); *Harris*, 2009 WL 3030803, at *3.

     Bird's argument is that the ALJ did not follow the above legal standards relating to

persons of advanced age. In that regard, he asserts that the ALJ did "not acknowledge or discuss

his obligation to determine whether [Bird's] skills would 'readily transfer' to jobs requiring 'very

little, if any, vocational adjustment in terms of tools, work processes, work settings, or the

industry between [Bird's] past jobs and the jobs named by the vocational expert[,']" (D.I. 14 at 6), and "did not discuss [the issue] in [his] decision[,]" (*id.* at 8). Indeed, Bird argues that the ALJ "did not show any indication that [he] even knew that [the special rules applicable to a claimant of advanced age] was an issue . . . and did not pose any question to the [VE] designed to address this outcome-determinative issue." (*Id.*) For a number of reasons, however, the Court disagrees with Bird's analysis.

For one thing, contrary to Bird's arguments, in his decision the ALJ: (1) *did* acknowledge and discuss his obligation to account for Bird's advanced age in assessing the transferability of Bird's skills; (2) *did* discuss the issue in some detail; and thus (3) *did* show an indication that he understood it was "an issue."[8] To that end, in his decision, the ALJ repeatedly noted that he was considering several factors—one being the claimant's age—in "determining whether a successful adjustment to other work can be made[.]" (Tr. at 37) The ALJ also made a point to state that at the time of the alleged disability onset date, Bird was 59 years old, "which is "defined as an individual of advanced age" and noted that Bird later "changed age category to closely approaching retirement age[.]" (*Id.*) And in explaining why he felt that Bird's previously-acquired skills would be transferrable to the jobs of telephone solicitor, scheduler/appointment clerk and information clerk, the ALJ explained that: (1) the VE had been asked "if any occupations exist which could be performed by an individual with the same age [as Bird] . . . and which require skills *acquired in the claimant's past relevant work but no*

---

[8]       Indeed, it is hard to imagine that the ALJ was unaware of the special rules applying to persons of advanced age in this context. This is because during the administrative hearing (just after the VE's testimony concluded), Bird's counsel raised this very issue with the ALJ. Bird's counsel there noted that "language in the Grids. . . talks about transferrable skills for individuals over 55 years of age" and requires that the skills need to be "readily transferrable and that there is very little, if any, training that needs to be done." (Tr. at 87)

*additional skills*"; (2) the VE concluded that the three above-referenced jobs at issue fit that bill;

(3) the ALJ had confirmed that the VE's testimony was consistent with the Dictionary of

Occupational Titles ("DOT"); and (4) the ALJ's decision was premised on the fact that "[t]he

[VE] testified [that] the claimant's previous work is so similar to the jobs recited above that *the*

*claimant would need to make very little, if any, vocational adjustments in terms of tools, work*

*processes, work settings, or the industry*[.]" (*Id.* at 38 (emphasis added))

Additionally (and also contrary to Bird's position), during the administrative hearing the

ALJ *did* pose questions to the VE that were "designed to address this outcome-determinative

issue." Earlier in the VE's testimony, after questioning Bird about his prior employment as a

home improvement sales representative, the VE established that Bird utilized the following skills

in that position: (1) the ability to order materials by phone; (2) scheduling; (3) overseeing the

work of home improvement crews; (4) making and keeping work-related records; and (5)

engaging in customer service-related tasks. (*Id.* at 74-77) Thereafter, the ALJ asked the VE,

with regard to the telephone solicitor job, whether "there [would] be any skills . . . required for

that job that are not required for the job from which these skills transfer [i.e., the prior home

improvement sales representative position]?" (*Id.* at 80) The VE replied "[n]o" and said that

Bird's skills would be "highly and readily transferable." (*Id.*) The ALJ followed up by asking

whether "the vocational adjustment would be minimal at best[,]" to which the VE responded that

it would be "[v]ery minimal" and that there would be "[v]irtually none." (*Id.*) As to the other

two possible jobs mentioned in the ALJ's decision (scheduler/appointment clerk and information

clerk), the VE similarly confirmed that "those other two jobs again would not require additional

skills not required of the [claimant's previous home improvement] sales job[.]" (*Id.* at 81)

Again, the VE said the skills would be "highly and readily transferable[.]" (*Id.*)

23

In sum, the ALJ recognized the legal issue at play, gathered the appropriate data and made a decision supported by substantial evidence (i.e., that Bird would have needed to make very little, if any, vocational adjustment in taking on one of the three jobs listed by the VE). In his decision, the ALJ directly cited to the relevant legal standard in addressing the transferability issue. Each of the three jobs listed by the VE (which have an SVP of 3 or 4) are ones where the "same or lesser degree of skills is required" as compared to Bird's prior sales job (which had an SVP of 6). 20 C.F.R. § 404.1568(d)(2); *see also* (Tr. at 37); *Solomon v. Comm'r of Soc. Sec. Admin.*, No. CV-18-00306-PHX-DWL, 2019 WL 1359129, at *4 (D. Ariz. Mar. 26, 2019); *Engel v. Colvin*, Case No. SACV 14-01989-JEM, 2015 WL 6453081, at *5 (C.D. Cal. Oct. 23, 2015). And, as is set out above, the ALJ relied on the VE's credible and plausible explanation that: (1) certain skills were required by Bird's former job position; (2) the three other jobs required use of some of those skills but no additional skill sets; such that (3) there would be practically no vocational adjustment in moving from Bird's prior job to any of these three other jobs.

In nevertheless arguing that the ALJ committed error here, Bird devotes several pages of briefing to listing certain codes ("Work Field," "Materials, Productions, Subject Matter, and Services" (or "MPSMS") and "Industry") that are found in the DOT; the cited codes relate to Bird's prior home improvement sales position and the three jobs cited by the VE as requiring comparable work skills. (D.I. 14 at 8-10) Bird's argument is that because the respective groups of codes differ at times, this must demonstrate that the respective jobs "*show[] little commonality*" and that "there is good reason to believe that the [three jobs cited by the VE] cannot be performed without more than '*very little, if any*, vocational adjustment.'" (*Id.* at 9-10 (emphasis in original))

The Court disagrees that these codes do the work that Bird requires of them. For one

thing, when the Court compares the listed codes for Bird's past home improvement sales position

to the codes relating to the telephone solicitor job, the two sets of codes actually seem very

similar. (D.I. 14 at 10 (Bird acknowledging that "there is admittedly some minimal similarity

between those two jobs)) Indeed, two of the three relevant codes ("Work Field" and "Industry")

appear to overlap.[9] As for the other two jobs cited by the VE (scheduler/appointment clerk and

information clerk), even to the extent that their relevant DOT job codes differ from those relating

to Bird's prior employment position, that certainly is not dispositive. After all, the applicable

Social Security regulations state that "complete similarity" between jobs is not required. 20

C.F.R. § 404.1568(d)(3).[10] Beyond that, what Bird is really asking the Court to do here is to *re-

weigh* the evidence—to compare the evidence mustered by the VE to that related to these codes,

and to then determine that the quantum of evidence swings more heavily in favor of Bird than

the Commissioner. Yet, as noted above, the law does not permit the Court to go down this path.

*See Solomon*, 2019 WL 1359129, at *4 (rejecting plaintiff's argument that because the MPSMS

codes for his prior work position and a possible future work position were different, this meant

that plaintiff would require significant vocational adjustment to work in the new position, and

---

[9]     More particularly, the DOT "Work Field" code for the two jobs is identical ("292
– merchandising – sales"). (D.I. 14 at 9 (emphasis omitted)) And the "Industry" code for the
prior home improvement sales representative job is listed as "[w]holesale[,]" while the
"Industry" code for the telephone solicitor job is listed as "[a]ny" (i.e., a field that would
presumably include within it the "wholesale" industry). (*Id.* (emphasis omitted))

[10]     *See Garcia v. Astrue*, No. 1:11-cv-00774-SKO, 2012 WL 4091847, at *9 (N.D.
Cal. Sept. 17, 2012) (noting, in a case where the plaintiff was of advanced age at the time of
decision, that the "[p]laintiff's contention that the VE must identify jobs with identical work
fields is not persuasive. *Alternate* work does not mean *identical* work.") (emphasis in original)
(citing 20 C.F.R. § 404.1568(d)(3)); *see also Engel*, 2015 WL 6453081, at *5 (concluding the
same in a case where the plaintiff was of advanced age at the time of the decision).

noting that the "ALJ's transferability determination was supported by the [VE's] testimony, which is itself substantial evidence sufficient to uphold the ALJ's decision"); *Cherwink v. Comm'r of Soc. Sec.*, Case No. 17-cv-00082-JSC, 2018 WL 1050194, at *6 (N.D. Cal. Feb. 26, 2018) (same); *Garcia v. Astrue*, No. 1:11-cv-00774-SKO, 2012 WL 4091847, at *7-8 & n.6 (N.D. Cal. Sept. 17, 2012) (rejecting the plaintiff's argument that the ALJ erred in finding that his prior skills were transferrable to jobs identified by the VE because the MPSMS codes for the respective jobs differed, and noting that the Court could find no authority for the proposition that the VE is required to rely only on the MPSMS in making a transferability determination).

In the end, the Court does not see how the ALJ failed to apply the special rules relating to transferability. And it finds the ALJ's decision about transferability of skills to be supported by substantial evidence. Thus, Bird's first claim of error is unavailing.

### 2.    The ALJ's Decision Not to Classify Bird's Depression as a "Severe" Impairment at Step Two

Bird's other claim of error is that at step two in the disability analysis, the ALJ erred in determining that Plaintiff's depression was not a "severe impairment." (D.I. 14 at 11) Bird's main argument here is that the ALJ failed to appropriately consider and weigh the opinions of Bird's treating physicians Dr. Yacoub and Dr. Castillo and consultative examiner Dr. Saez (each of whom Plaintiff says implicitly or explicitly concluded that Bird's depression amounted to a severe impairment). (*Id.* at 11-20) Bird argues that this error in turn led to the ALJ's later failure to "account for limitations related to [Bird]'s mental impairments in the RFC." (*Id.* at 12) In short, Bird argues that the ALJ committed reversable error by "improperly disregard[ing]" the fact that Bird's "mental impairments limit his ability to work," thus "causing more than minimal limitations[.]" (*Id.*)

### a. Legal Standards

With regard to the ALJ's step two determination that Plaintiff's depression was not a severe impairment, a non-severe impairment is one that "does not significantly limit [the claimant's] physical ability to do basic work activities." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (internal quotation marks and citations omitted, alteration in original). This step two analysis is a *de minimis* screening device to dispose of groundless claims; thus, an impairment may be found "'not severe' only if the evidence establishes a slight abnormality . . . [that has] 'no more than a minimal effect on an individual's ability to work.'" *Id.* (citation omitted).

In making this step two determination, the ALJ was required to follow Social Security regulations that explain how to assess the opinions of Bird's physicians. In this regard, "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citation omitted); *see also Dougherty v. Astrue*, 715 F. Supp. 2d 572, 580 (D. Del. 2010). The applicable Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2); *see also Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).

These regulations require that if a treating source's opinion as to the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it must be given "controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also Fargnoli*, 247 F.3d at 43. If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he or she must then determine what weight to give the opinion by considering several factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the degree to which the physician presents relevant medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the degree to which the opinion relates to an area in which the physician specializes; and (6) any other factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

When a treating physician's opinion conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (citation omitted). "The ALJ must consider all evidence and give some reason for discounting the evidence [he or] she rejects." *Id*. An ALJ may reject a treating physician's opinion as long as the rejection is due to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation, or lay opinion." *Morales*, 225 F.3d at 317. And in coming to his or her conclusion, an ALJ need not "make reference to every relevant treatment note in a case where the claimant, such as [Bird], has voluminous medical records[.]" *Fargnoli*, 247 F.3d at 42.[11]

---

[11] New regulations regarding how to assess treating source opinions are now in effect for claims filed after March 27, 2017. 20 C.F.R § 404.1520(c); *see also* 20 C.F.R. §

### b. The ALJ's Decision

With regard to Dr. Yacoub's opinion about how Bird's depression affected Bird's ability to work, the ALJ explained that he gave the opinion "little weight"; this was because it was "inconsistent with the evidence of record as a whole that supports a non-severe impairment[.]" (Tr. at 35) The ALJ further noted that:

> [The opinion] is internally inconsistent with Dr. Yacoub's own observations and treatment history, specifically, that the claimant was dressed appropriately, had good eye contact, was cooperative, had no psychomotor agitation, had normal speech, an okay mood, full range affect, logical and coherent thought processes, intact memory, full orientation, and fair insight and judgment . . . Finally, the record indicates that the claimant only saw Dr. Yacoub only a few occasions, and that he last saw Dr. Yacoub in May 2015 at which time his medication was discontinued . . . .

(*Id.*)

With regard to Dr. Castillo's opinion, the ALJ similarly explained that he gave it little weight "for the same reasons and rationale as discussed in the analysis of Dr. Yacoub's opinion." (*Id.* at 35-36) In addition, the ALJ noted that:

> [The opinion] is inconsistent with Dr. Castillo's own observations and treatment history, specifically, that the claimant was well-groomed, had a neat appearance, good eye contact, a fair ranged affect, no perceptual disturbances, organized and coherent thought process, logical and not psychotic thought content, full orientation, fair judgment, insightful insight, and good impulse control . . . . Finally, the record indicates that the claimant's treatment with Dr. Castillo has begun only recently and that he has seen Dr. Castillo on only approximately two occasions, in April and June 2016 . . . .

(*Id.* at 36)

---

404.1527. Because the claim at issue was filed earlier than that date, the prior rules (cited above and articulated in 20 C.F.R. § 404.1527) are still applicable here.

As for Dr. Saez's opinion, the ALJ's decision noted that it was given "little weight" too; this was because the record "d[id] not support the degree of limitation in the areas of daily activities and the ability to sustain work performance and attendance in a normal work setting as [Dr. Saez] opined." (*Id.* at 35)[12] The ALJ then cited to evidence of record that, in the ALJ's view, contradicted Dr. Saez's conclusions that Bird was moderately limited in these functional areas. (*Id.*)

### c. Substantial Evidence Supported the ALJ's Conclusions

In the Court's view, the ALJ did not commit error in assessing Bird's depression at step two or in his consideration of the opinions of Bird's physicians regarding this issue. In his decision, the ALJ cited to and applied the appropriate Social Security regulations relating to treating physician opinions. (*Id.* at 33, 35 (citing 20 C.F.R § 404.1527) And there was substantial evidence of record to support the ALJ's conclusion that Bird's depression had no more than a minimal effect on his ability to work. The Court so concludes for a number of reasons.

First, various portions of the record can be read to indicate that, although Bird suffered from depression, that condition did not significantly limit his work-related abilities. The ALJ cited to much of this record evidence in his decision, including that:

- During an April 2012 mental health assessment, a WVAMC LCSW noted that Bird's appearance was good and appropriate, that he was cooperative, focused and engaged, his affect was appropriate, he demonstrated good insight and judgment, his

---

[12] The opinion of Dr. Saez that the ALJ was referring to here is the two-page "Psychological Functional Capacities Evaluation Form[,]" which Dr. Saez filled out on October 2, 2013. On that form, Dr. Saez concluded that Bird would have "moderate" limitations in only the "restriction of daily living" and "sustain work performance & attendance in a normal work-setting" categories. (Tr. at 449-50; *see also* D.I. 16 at 9)

memory was fine and that he exhibited no problematic behaviors.
(*Id*. at 432-33 (*cited in id*. at 24-25))  The LCSW noted that Bird
was suffering from an "adjustment disorder" and depression as a
result of the difficulties in finding work due to his back pain.  (*Id*.
at 432-33)

- After an October 2013 evaluation, Dr. Saez noted that Bird had
  performed in a "borderline" manner on a mental status exam, but
  also concluded that some of Bird's performance on the test
  suggested that Bird was engaging in "symptoms magnification" (or
  exaggeration of his symptoms).  (*Id*. at 447 (*cited in id*. at 25))  Dr.
  Saez concluded that Bird's back pain was likely the most
  significant issue he faced and that his "current depression and
  anxiety reactive to pain and stress are *relatively mild*."  (*Id*.
  (emphasis added))  Dr. Saez's report also noted that Bird had
  previously been capable of working while managing any episode
  of depression or anxiety, and that Bird had a "[g]ood" prognosis
  and "would benefit from ongoing pain management to address
  back pain issues."  (*Id*. at 447-48)  In Dr. Saez's opinion, Bird
  "possesse[d] capacity for performing various job functions
  including:  understanding, carrying out and remembering
  instructions, responding appropriately to supervision, co-workers,
  and work pressures in a work setting on a psychological basis."
  (*Id*.)

- In November 2014, Bird spoke by phone with a WVAMC nurse.
  During a conversation regarding his psychological state and a
  recent missed appointment with his psychologist, Bird reported
  that he was "doing well" and did not need to be seen at that time.
  (*Id*. at 568 (*cited in id*. at 25))

- In a December 2014 visit with a WVAMC LCSW, Bird was noted
  as having, *inter alia*, a normal mood, good eye contact, good
  grooming, appropriate intensity and affect, appropriate thought
  content, coherent thought processes and good judgment.  (*Id*. at
  560-61 (*cited in id*. at 25))

- In February 2015, during an examination by Dr. Yacoub in which
  he was diagnosed with anxiety, Bird was dressed appropriately,
  made good eye contact, was cooperative, had a full range of affect,
  had intact memory and had no psychomotor agitation.  (*Id*. at 545
  (*cited in id*. at 25))  And at a May 2015 follow-up appointment,
  Bird reported that he was doing "ok" and had a good general
  appearance, was dressed appropriately, was cooperative, and
  exhibited full range of affect.  (*Id*. at 517 (*cited in id*. at 25-26))

Bird reported that he had stopped taking Zoloft, in light of the fact that he was taking other medication to treat his hepatitis C.  (*Id.*)

- In April 2016 and again in June 2016, Bird was assessed by Dr. Castillo.  In both visits he was reported to be groomed and neat, cooperative and well-oriented (though in the latter visit, Bird was distressed by the recent death of his mother and was reported to be tired and having poor memory).  (*Id.* at 609-10, 625-26 (*cited in id.* at 26))  Bird had explained to Dr. Castillo that he had not needed to take Sertraline for some time as of the April 2016 visit; Dr. Castillo re-prescribed Sertraline to Bird in April 2016 and continued that prescription during the June 2016 visit.  (*Id.* at 609-10, 625-26 (*cited in id.* at 26))

Second, the ALJ relied upon and gave "great weight" to the opinions of state agency physicians Dr. Siegel and Dr. Sadovnik, which supported the ALJ's conclusions.  (*Id.* at 34-35)  Both of these psychological consultants found Bird's depression to be a non-severe impairment.  (*Id.* at 34)  Although these opinions were offered in 2013 and 2014 respectively, the ALJ noted that they were "consistent with the evidence as a whole that supports non-severe impairments[.]"  (*Id.*)  More specifically, the ALJ explained that these opinions were supported by "mental status examinations on multiple occasions" that observed positive mental health traits, treatment records indicating that Bird had sought mental health treatment only sporadically, reports indicating that Bird had only taken medication sporadically and had at times done well without it, and Bird's testimony as to his ability to take care of everyday needs.  (*Id.* at 34-35)  As noted above, there is such record evidence, and that evidence does align with Dr. Siegel's and Dr. Sadovnik's opinions.

Third, as to Dr. Saez's opinions (which were offered in late 2013), the ALJ persuasively cited to record evidence (including evidence from Dr. Saez's own near-in-time treatment notes) that can be read to contradict the physician's conclusion that Bird was even "moderately" limited in:  (1) activities of daily living and (2) the ability to sustain work performance and attendance.

(*Id.* at 35) With regard to Bird's activities of daily living, the ALJ noted that Bird himself reported that he could perform most such activities, including driving, personal care, "bathing, dressing, toileting, transfers, bladder/bowel control, eating, transportation, medication, money management, and telephone use," and could "prepare his own meals, [] pay bills, count change, handle a savings account, and use a checkbook." (*Id.*) The ALJ's conclusion here was supported by Bird's written statements in the record, (*id.* at 270-74), and by Dr. Saez's own summary of Bird's abilities, (*id.* at 446). And with regard to Bird's ability to sustain appropriate work performance and attendance, as was noted above, Dr. Saez himself concluded that Bird "possesses the capacity for performing various job functions[,]" including "understanding, carrying out and remembering instructions, responding appropriately to supervision, co-workers, and work pressures in a work setting on a psychological basis." (*Id.* at 448) If Bird possessed the ability to perform many job functions, then it does not seem that his depression significantly limited (or even "moderately" impacted) his ability to work. Moreover, as the ALJ noted, the record also supports the conclusion that Bird could "could pay attention for two or three hours at a time, that he finished what he started, he could follow written and spoken instructions, and got along fine with authority figures" and that he "had intact perceptions, appropriate thought content, coherent and logical thought processes, average intellect, good judgment, and intact memory[.]" (*Id.* at 35; *see also id.* at 275-76, 517, 545, 610, 626) Thus, there substantial evidence to support the ALJ's decision to give Dr. Saez's conclusions (regarding Bird's "moderate" limitations) little weight.[13]

---

[13] That said, the Court notes that it is not even clear that Dr. Saez, in concluding that Bird had "moderate" limitations in these two areas, was asserting that Bird's depression amounts to a severe impairment. As was noted above, at the same time that Dr. Saez was noting these

Fourth, with regard to Dr. Yacoub and Dr. Castillo, their opinions (as set out in the evaluation forms that they submitted) not only appear to conflict with the evidence cited above, but also at times with their own treatment notes.  For example, in their evaluation forms,[14] both Dr. Yacoub and Dr. Castillo concluded that Bird had "limited" ability to "[a]dhere to basic standards of neatness and cleanliness[;]" yet during all of Bird's office visits with both physicians, Bird had always been described as being appropriately dressed and well-groomed. (*Id*. at 509, 517, 610, 626, 654, 658)  Similarly, in their evaluation forms, Dr. Yacoub and Dr. Castillo marked down that Bird was either "limited" or "seriously limited" in the categories of "[i]nteract[ing] appropriately with the general public" and "[m]aintaining socially appropriate behavior[;]"  however, during Bird's office visits, these same doctors remarked that Bird was always cooperative, insightful and polite.  (*Id*. at 509, 517, 610, 626, 654, 658)  Additionally, Dr. Castillo noted in his evaluation form that Bird experienced suicidal thoughts, (*id.* at 651)—yet in every 2016 office visit with Dr. Castillo (including one occurring on the same week that Dr. Castillo filled out the evaluation form), Bird was listed as having *denied* any suicidal thoughts, (*id*. at 610, 626, 658).  Thus, the Court concludes that, with regard to Dr. Yacoub and Dr.

---

two "moderate" limitations, he provided a narrative opinion about Bird's abilities, in which he concluded that Bird could in fact perform various job functions.  (*See* D.I. 16 at 12)

[14]     It is worth noting that both of these evaluation forms were forms where the physician was largely required to either only check a box or fill in a blank.  The United States Court of Appeals for the Third Circuit has referred to such forms as "weak evidence at best" and noted that their "reliability is suspect[.]"  *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (internal quotation marks and citation omitted); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source provides relevant evidence to support a medical opinion . . . the more weight we will give that medical opinion.").

Castillo, the ALJ gave "good reasons" for why he chose to give these treating physicians' opinions lesser weight.[15] *See* 20 C.F.R. § 404.1527(c)(2)(ii).

For all of the reasons set out above, the Court finds that the ALJ did not err at step two in concluding that Bird's depression did not amount to a severe impairment.

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, Bird's motion for summary judgment is DENIED and the Commissioner's cross-motion for summary judgment is GRANTED. An appropriate Order will issue.

---

[15]    Bird further argues that Dr. Yacoub's and Dr. Castillo's opinions "are remarkably consistent in describing [Bird]'s more than minimal mental limitations." (D.I. 14 at 14)  Yet although there are some similarities, the doctors' respective evaluation forms are really not all that consistent. When providing an assessment as to Bird's mental abilities and functional capacities, Dr. Yacoub categorized Bird's deficiencies as no more than "[l]imited" or "[m]oderate" respectively, (Tr. at 508-10), whereas Dr. Castillo found Bird's abilities in most of those areas to be "[s]eriously limited," "[p]oor," or "[m]arked," (*id.* at 653-55). Those assessments do not seem all that "consistent" with each other; Dr. Yacoub clearly found Bird (at least as of 2014) to be far less limited than did Dr. Castillo (as of 2016).